RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                              *Plaintiff-Appellee*,

     *v.*

RICKY ANTHONY LANIER (16-6655); KATRINA RESHINA LANIER (16-6657)

                            *Defendants-Appellants*.

Nos. 16-6655/6657

_____

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:14-cr-00083—J. Ronnie Greer, District Judge.

Argued:  December 15, 2020

Decided and Filed:  February 11, 2021

Before:  MOORE, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  J. Alex Little, BURR & FORMAN LLP, Nashville, Tennessee, for Appellants. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.  **ON BRIEF:**  J. Alex Little, BURR & FORMAN LLP, Nashville, Tennessee, John-David H. Thomas, WALLER, LANSDEN, DORTH & DAVIS, LLP, Nashville, Tennessee, for Appellants.  Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. This case arises from a phone-a-friend gone awry. In 2015, Ricky and Katrina Lanier were prosecuted for allegedly committing fraud against the federal government. As the jury deliberated the Laniers' fate, Juror 11 called her friend, a state prosecutor who was not involved with the federal government's case against the Laniers. The friend immediately reported the call to the district court. Although the juror told her friend that there was a "problem with the deliberations," the district court rejected the Laniers' request to investigate jury bias. Following our 2017 decision that the Laniers must be guaranteed a "meaningful opportunity" to establish jury bias, the district court summoned the jurors and the friend to attend a *Remmer* hearing and ordered them not to discuss or research the case. Defying the district court, Juror 11 texted the same friend four days before the *Remmer* hearing; the juror's messages solicited the friend's input about the Laniers' case and suggested that the juror had looked the case up online. True to form, the friend reported the texts to the district court. The district judge failed to notify the Laniers of these texts, and the Laniers first learned of the messages from the friend's testimony at the *Remmer* hearing.

The district court ordered Juror 11 to preserve her texts from the prior week and her web-browsing history from the prior two weeks but refused to compel the juror to produce the data. After three weeks of back-and-forth among the Laniers, the district court, and this court, the district court ordered Juror 11 to turn over her phone and laptop. The district court tasked his IT staffer and law clerk to examine the devices. The duo discovered that the web-browsing data that the court had ordered Juror 11 to preserve had been manually deleted. Neither person was a forensic expert; they merely took screenshots and did not forensically examine the devices. The Laniers sought a full forensic exam of both devices and suggested search parameters. The district judge and his clerk then discussed the Laniers' proposals with a court-appointed expert. None of the parties were present for these conversations. Based on the expert's ex parte advice, the district court denied the Laniers' requests. After we issued an order that reiterated that the Laniers must be granted a "meaningful opportunity" to investigate and prove their claim of juror

bias, the district court finally allowed the Laniers' expert to examine forensically the juror's phone and web-browsing data. Juror 11 then revealed that she had discarded her phone several months earlier and suggested that she had manually deleted her web-browsing data. Because the juror's phone is gone and due to the passage of time, any potentially deleted texts and web-browsing data are unrecoverable.

The district court denied the Laniers' motions for a new trial, presenting us with the fourth occasion to review this quinquennial saga. We conclude that the Laniers were deprived of a "meaningful opportunity" to demonstrate juror bias and that the Laniers are entitled to a new trial to be held before another district judge. Accordingly, we **REVERSE** the judgment and **REMAND** for further proceedings in accordance with this decision.

## I.  BACKGROUND

Five years ago, Ricky and Katrina Lanier were tried for conspiracy, wire fraud, and major fraud against the federal government. R. 151 (Second Superseding Indictment at 1–28) (Page ID #1456–83). On the morning of December 15, 2015, the jury deliberated the Laniers' case. Early that morning, Juror 11 called her friend Teresa Nelson, a state prosecutor who is not involved in the Laniers' case. The juror told Nelson that there was a "problem with the deliberations." R. 212 (Trial Tr. at 3) (Page ID #2511). Nelson reported the call to the district court at 8:30 to 8:45 AM. *Id.* Shortly thereafter, a court officer told the judge that the jury was "very clearly divided into two groups this morning and they're angry with each other[.]" *Id.* at 4 (Page ID #2512). At 9:55 AM, the district court notified the attorneys of Juror 11's phone call with Nelson and of the court officer's report. *Id.* at 3 (Page ID #2511). At 10:37 AM, the jury convicted the Laniers. *Id.* at 6–10 (Page ID #2514–18). The Laniers sought to interview the jurors and moved for a mistrial. *Id.* at 11–12 (Page ID #2519–20). The district court denied the Laniers' request, and an appeal ensued.[1]

---

[1]Nelson and Juror 11 may have discussed the case at least once before the phone call. At the *Remmer* hearing, Nelson testified that either Juror 11 or her husband ran into Nelson and mentioned that Juror 11 was serving on a federal jury. R. 333 (*Remmer* Tr. at 7–9) (Page ID #6631–33). Neither Juror 11 nor Nelson reported this conversation to the district court and the Laniers' attorneys learned of this interaction only after trial. R. 223-1 (Leonard Decl. at 1–2) (Page ID #2978–79). In *United States v. Lanier*, we observed that this exchange had occurred. *United States v. Lanier* (*Lanier I*), 870 F.3d 546, 549 (6th Cir. 2017). The Government also refers to this

In September 2017, we vacated the Laniers' convictions, ordered the district court to conduct a *Remmer* hearing, and retained jurisdiction. *See United States v. Lanier* (*Lanier I*), 870 F.3d 546, 551 (6th Cir. 2017). A month later, the district court sent the jurors and Nelson an order that required them to attend a *Remmer* hearing on January 11, 2018 and instructed that they "must not discuss [their] jury service or this case with any other person" and "must not conduct any research into this case or seek out any information about this case or the defendants." R. 322 (10/11/17 Order at 2) (Page ID #6427). In mid-December, the Laniers filed their first motion seeking the district judge's recusal; the Laniers expressed concern that the district judge's conversation with Nelson about Juror 11's phone call took place without the parties present. R. 324 (12/11/17 Mot. at 1, 5–9) (Page ID #6430, 6434–38). The district court denied their motion. R. 331 (1/3/18 Order at 1) (Page ID #6599).

On January 7, 2018—i.e., four days before the scheduled *Remmer* hearing—Juror 11 texted Nelson:

> Hope you and [Nelson's daughter] are much better. I have a question for you, the federal case I was a juror on two years ago, I have received a summons to report to Gville this Thursday. When I looked online that is what was listed. 2:14cr83 (JRG-LF) REMMER hearing-Ricky Lanier ETAL. Does any of that lead you to know what in the world this is about two years later [emoji]? Thanks.

R. 333 (*Remmer* Tr. at 62–63) (Page ID #6686–87); R. 480 (3/2/20 Order at 7) (Page ID #8906). The two women texted about unrelated matters before Juror 11 followed up: "did you see the 2nd part of my original text on the Federal case?" R. 333 (*Remmer* Tr. at 65) (Page ID #6689); R. 480 (3/2/20 Order at 7) (Page ID #8906). Nelson did not respond. R. 333 (*Remmer* Tr. at 67) (Page ID #6691). Nelson reported the texts to the district court, but the court failed to update the Laniers. *Id.* at 68–69 (Page ID #6691–92); R. 480 (3/2/20 Order at 37–38) (Page ID #8936–37).[2]

---

interaction. Appellee's Br. at 9 ("Before the telephone call that eventually launched the *Remmer* inquiry, Juror 11 may have mentioned that she had been summoned for jury duty, but did not otherwise discuss the trial."). But the Laniers do not discuss this run-in at length in their brief, and this interaction is not the focus of our review in this appeal.

[2]The district court later explained that it "deci[ded] to allow the new information to be revealed at the hearing, rather than a few days prior," R. 396 (7/17/18 Order at 11) (Page ID #7440), and that "the best course of action was for the information to be relayed to the parties directly by the sources involved so the parties could reveal the material in its purest form." R. 480 (3/2/20 Order at 37) (Page ID #8936).

The *Remmer* hearing took place on January 11, 2018. Nelson, Juror 11, and the remaining jurors testified. Nelson described the phone call that took place.[3] According to Nelson, Juror 11 told her that "there's something, there's some issue, some problem, some something that's happening, and I don't know what I need to do; and you're a lawyer, and I know you're a lawyer, so I'm calling you[.]" R. 333 (*Remmer* Tr. at 23) (Page ID #6647). Nelson attested that she told Juror 11 "you can't discuss this with me" and that "if there's a problem" the juror should speak to "a bailiff or a deputy clerk or someone like that." *Id.* at 21–22 (Page ID #6646). Nelson brought up Juror 11's pre-*Remmer* hearing texts, *id.* at 12 (Page ID #6636), which is how the Laniers learned of these texts, *see* Appellants' Br. at 5.

At the *Remmer* hearing, Juror 11 thrice denied that she had spoken about the case to anyone besides her husband during the trial or deliberations before she admitted to calling Nelson "on the way [to court] one, one time and expressed my concern over the length of [the case] and how stressed I was." R. 333 (*Remmer* Tr. at 53) (Page ID #6677). The juror insisted that Nelson and she did not discuss the case on the phone and that she did not mention the call to the other jurors during deliberations. *Id.* at 55–57 (Page ID #6679–81). Initially, Juror 11 attested that she did not contact anyone about the *Remmer* hearing. *Id.* at 57–58 (Page ID #6681–82). She then confirmed that she had texted Nelson before the hearing but swore that she did not reach out to—nor did they—discuss the case. *Id.* at 76–78 (Page ID #6700–02). She eventually yielded that she "sent [Nelson a text with] the little initials and stuff [i.e., the case citation,]" *id.* at 78 (Page ID #6702), to ensure that she was "prepared" because she could not find the "paperwork" that the district court had sent to her, *id.* at 84 (Page ID #6708). After the Laniers' counsel confronted Juror 11 with a screenshot of her text, the juror admitted that she had texted Nelson because she "didn't know if . . . we had to rehash the case[]"; to seek Nelson's "legal opinion" of "what could the realm of this, you know, encompass" and to see "if there was any information [Nelson] could, you know, tell me that, about the case—or not the case, but about what I needed to do or why, you know, we were going, that she would offer that

---

[3]The Laniers describe Nelson's credibility as "unimpeached." Appellants' Br. at 19.

information." *Id.* at 90–93 (Page ID #6714–17).[4]   Juror 11 twice denied having researched the case, but she later admitted that she used her office laptop to Google "Greeneville federal court" and to access the court's website to check "what time we were supposed to be here, what day and that[.]" *Id.* at 49, 60, 78–79 (Page ID #6673, 6684, 6702–03).

Each of the remaining jurors swore that they and, to their knowledge, no other juror had been exposed to any external information concerning the case.  R. 380 (*Remmer* Tr. at 28–99) (Page ID #7219–90).  The foreperson explained that "tension" arose during deliberations because Juror 5—who had expressed that he wished to prolong the trial to extend his scheduled vacation time—would not "budge" on one of the counts.  *Id.* at 20–22 (Page ID #7211–13).   The foreperson admonished Juror 5, who returned the next day "open to discuss" the case, allowing the jury to reach a verdict.  *Id.* at 22–24 (Page ID #7213–15).

At the *Remmer* hearing's close, the Laniers sought to examine Juror 11's texts from the prior week and her web-browsing history from the prior two weeks.  R. 333 (*Remmer* Tr. at 98, 101) (Page ID #6722, 6725).  The district court initially ordered Juror 11 to preserve the data, *see id.*, but later refused to compel her to produce the data, R. 335 (1/16/18 Mot. at 1) (Page ID #6729); R. 340 (1/26/18 Order at 1) (Page ID #6761).  After three weeks of back-and-forth between the Laniers, the district court, and this court, the district judge reconsidered.[5]   On February 8, the district court reiterated to Juror 11 that she had to preserve her texts and browsing history and ordered the juror to turn over to the court her phone and laptop.  R. 345 (2/8/18 Order at 1) (Page ID #7080).

---

[4]Juror 11 confirmed that she had received and understood the district court's order to not speak to anyone about the case. *Id.* at 82–84 (Page ID #6706–08).

[5]After the district court initially denied the Laniers' motion, the Laniers filed an emergency motion with this court.  No. 16-6655, 16-6657 R. 38 (Sixth Cir. 2/15/18 Order at 2).  The district court then ordered Juror 11 to produce the requested data, and we denied the Laniers' motion accordingly.  *Id.* at 3–4.

Juror 11, per the district judge's order, brought her phone and laptop to the district court on February 16. R. 396 (7/17/18 Order at 4) (Page ID #7433). The district court's IT staff member and law clerk—neither of whom were qualified forensic experts—received both devices. Starting with her phone, the duo took screenshots of Juror 11's text messages and "documented" "[w]eb browser history dating back earlier than December 27, 2017[.]" *Id.*; R. 384 (4/11/18 Hr'g Tr. at 6–7) (Page ID #7336–37). But when the pair turned to the laptop, they discovered that Juror 11's search history dated back to only February 7—the day before the court ordered the juror to preserve her data. R. 396 (7/17/18 Order at 4) (Page ID #7433); R. 384 (4/11/18 Hr'g Tr. at 8) (Page ID #7338). On March 21, the district court set a hearing for April 11 to allow the parties to review the collected data. R. 351 (3/21/18 Order at 1) (Page ID #7099). But the court waited until an April 3 status conference—six weeks after court had inspected the devices and merely a week before the upcoming hearing—to apprise the Laniers of the vanished data. R. 352 (4/3/18 Min. Entry); R. 357 (4/5/18 Mot. at 2) (Page ID #7120); R. 396 (7/17/18 Order at 4) (Page ID #7433).[6]

On April 5, the Laniers moved the district court to allow their expert to examine forensically Juror 11's computer; the Laniers submitted an affidavit from their expert that expressed that recovering deleted data becomes more difficult as time passes and, accordingly, voiced urgency. R. 357 (4/5/18 Mot. at 1, 3–4) (Page ID #7119, 7121–22). At the April 11 hearing, the district court's IT staffer testified that he had merely taken screenshots of the phone and web browser history and did not forensically image the devices. R. 384 (4/11/18 Hr'g at 6–7) (Page ID #7336–37). Expressing concerns that the screenshots inadequately captured the apposite data, the Laniers amended their motion on April 13 and asked the district court to allow their expert to examine forensically Juror 11's phone. R. 367 (4/13/18 Mot. at 2–3) (Page ID #7146–47). The court responded by appointing its own expert, Derek Johnson, to examine only Juror 11's computer—but not her phone—and ordered the Laniers to foot Johnson's bill. R. 374 (4/17/18 Order at 1) (Page ID #7165). On April 19, the Laniers proposed search parameters for both devices. R. 375 (4/19/18 Proposal at 3–8) (Page ID #7169–74). The Government opposed

---

[6]The district court later explained that this delay was due to its considering "whether the [Laniers] were entitled to the information [about the deleted browsing data] at all." R. 396 (7/17/18 Order at 13) (Page ID #7442).

the forensic search of Juror 11's phone, but did not contest the Laniers' search parameters. *See* R. 396 (7/17/18 Order at 5) (Page ID #7434).

The district court then communicated ex parte with Johnson. According to the district judge,[7] he "provided the [Laniers'] submissions to [] Johnson for the purpose of fully informing him of the progress in the case." *Id.* at 6 (Page ID #7435). On April 23, the judge's law clerk called Johnson "to gain more information on what a forensic examiner requires of search instructions to conduct a thorough and proper evaluation." *Id.* "Johnson provided his opinion that the parameters submitted and agreed to by the parties did not provide sufficient information for a forensic search." *Id.* at 7 (Page ID #7436). In a second, "later" conversation, the law clerk "communicated to [] Johnson what the [district c]ourt determined was the proper scope of the search: an adaptation of what the defendants[] sought[.]" *Id.* Johnson "suggested" to the clerk that the court should permit him to create copies of hard drives and to speak with Juror 11's employer as well as with the staffer who discovered the missing data. *Id.* The parties were not present for or aware of any of these conversations. Appellants' Br. at 8, 44–46.

On April 26, the district court rejected the Laniers' proposed search parameters, vetoed any forensic examination of Juror 11's phone, set its own limited search parameters, and appointed Johnson to examine the juror's computer. R. 396 (7/17/18 Order 7–8) (Page ID #7436–37); R. 377 (4/26/18 Order at 1–6) (Page ID #7178–83). The court's order "included language that [] Johnson [had] suggested[.]" R. 396 (7/17/18 Order at 7) (Page ID #7436). The court billed the Laniers on May 16 for Johnson's time, and the invoice's line items alerted the Laniers to the ex parte conversations between the judge, his clerk, and Johnson. R. 383-1 (Johnson Invoice) (Page ID #7330). The invoice confirms that the judge or his law clerk spoke with Johnson ex parte for three hours across at least three conversations between April 19—i.e.,

---

[7]Because these communications were ex parte, all we know about the interactions between the district court and Johnson derive from the court's description in his orders of what happened. R. 396 (7/17/18 Order at 6–7) (Page ID #7435–36).

when the Laniers submitted their proposed search parameters—and April 26—i.e., when the judge denied the Laniers' requests. *Id.*[8]

The Laniers moved to disqualify the judge and Johnson. R. 387 (5/24/18 Mot. at 1) (Page ID #7378), R. 389 (5/29/18 Mot. at 1) (Page ID #7395). Around the same time,[9] Johnson reported his finding that the Google Chrome browser history on Juror 11's computer was manually deleted on February 7. R. 391 (Johnson Rep. at 1–2) (Page ID #7403–04). In July, the district court denied the Laniers' motions. R. 396 (7/17/18 Order at 1) (Page ID #7430). The Laniers filed with this court a petition of a writ of mandamus to compel the district judge to recuse. *See United States v. Lanier* (*Lanier II*), 748 F. App'x 674, 675 (6th Cir. 2018). Wary that a writ of mandamus is a "'drastic' remedy that should be reserved for 'extraordinary situations' in which 'the petitioner can show a clear and indisputable right to the relief sought[,]'" we declined to grant the writ. *Id.* (quoting *In re Surapaneni*, 14 F. App'x 334, 336 (6th Cir. 2001)). But we expressed that the district court's actions were "troubling" and reminded the district court that "the Laniers must be provided a 'meaningful opportunity' to investigate and prove their claim of extraneous influence." *Id.* at 677. We cautioned: "[t]his is not to say, however, that the Laniers' objections to the district court's decisions are without merit." *Id.* at 677–78.

---

[8]The invoice lists the following relevant line items:

| Description | | Hours | Rate | Cost |
|---|---|---|---|---|
| 4/13/2018 | Telephone consultation with Judge Greer | 0.5 | $0.00 | $0.00 |
| 4/21/2018 | Search parameters request evaluation | 1.5 | $250.00 | $375 |
| 4/22/2018 | Consultation with the Court regarding search parameters | 0.5 | $250.00 | $250.00 |
| 4/23/2018 | Telephone call from Emma Elliot, consultation regarding search parameters | 1 | $250.00 | $250.00 |

R. 383-1 (Johnson Invoice) (Page ID #7330). The Laniers argue, the Government does not dispute, and the district court appears to concede that the April 21, 22, and 23 line items were the ex parte conversations between the district court and Johnson. *See* Appellants' Br. at 45; Appellee's Br. at 19; R. 396 (7/17/18 Order at 8) (Page ID #7437). The Laniers do not contend that the April 13 telephone consultation was improper.

[9]Johnson's report is dated May 14, 2018 but was filed on May 29, 2018. R. 391 (Johnson Rep. at 1) (Page ID #7403).

In the wake of *Lanier II*, the district court scheduled a hearing for November 15, 2018 regarding the phone and the computer. R. 411 (9/11/18 Order) (Page ID #7767); R. 413 (10/15/18 Order at 19–20) (Page ID #7788–89). At the hearing, Johnson reiterated that the Google Chrome browsing history on Juror 11's laptop had been manually deleted on or about February 7. R. 462 (11/15/18 Hr'g Tr. at 16, 50) (Page ID #8190, 8224). The Laniers' forensic expert, Michael Morelli, then testified. Morelli attested that Google's servers may have captured Juror 11's deleted search history. *Id.* at 137–38 (Page ID #8311–12). The expert also expressed that the IT staffer and the law clerk's screenshots of Juror 11's phone failed adequately to capture all pertinent data. *Id.* at 139–40 (Page ID #8313–14). For example, Morelli explained, screenshots cannot document deleted messages or web-browsing history. *Id.* at 140 (Page ID #8314).

On November 27, the court ordered a forensic exam of Juror 11's phone; commanded Juror 11 to turn over the phone that she used between December 27, 2017 and February 7, 2018; permitted Morelli to extract the relevant data; and directed Juror 11 to submit her username and passwords for her Google account. R. 417 (11/27/18 Order 1 at 1) (Page ID #7800); R. 418 (11/27/18 Order 2 at 1) (Page ID #7802); R. 419 (11/27/18 Order 3 at 1) (Page ID #7804).[10]

But Juror 11's phone and web-browsing data were gone and unrecoverable. On November 30, Juror 11 left a voicemail with the district court's law clerk; the juror stated that she had traded in her phone for a new one in March 2018. R. 421 (12/3/18 Order at 1) (Page ID #7809); R. 463 (4/18/19 Hr'g Tr. at 6) (Page ID #8344). Put another way: Juror 11 discarded her phone just two months after the court ordered her to preserve her phone and web-browsing data at the *Remmer* hearing on January 11. At an April 18, 2019 hearing, Morelli testified that there are ways to recover deleted texts but that such methods require the physical phone. R. 463 (4/18/19 Hr'g Tr. at 17–19) (Page ID #8355–57).

At the April 18, 2019 hearing, Juror 11 denied that she had deleted her web browser history after the *Remmer* hearing, blaming any missing data on her employer "automatic[ally]"

---

[10]Morelli's analysis was delayed because Juror 11 initially provided the court with incorrect login information for her Google account. R. 480 (3/2/20 Order at 15) (Page ID #8914).

and "randomly" deleting web history on her computer when "they think there's a virus or something." *Id.* at 8) (Page ID #8346). Juror 11 attested that she deletes her browsing data "only" when her employer "tell[s]" her to. *Id.* The juror then contended that her employer had emailed her to tell her to delete her browsing data, suggesting that she deleted her web history. *Id.* at 8–10 (Page ID #8346–48). Yet Juror 11's employer states that it has no records indicating that it had told Juror 11 to delete her browsing history. R. 460-1 (Lamar Letter) (Page ID #8170)). Morelli testified at the April 18, 2019 hearing that the default setting in a Google account is to save web history but that a user had disabled this option on Juror 11's account. R. 463 (4/18/19 Hr'g Tr. at 26) (Page ID #8364). Thus, Google's servers lack a copy of Juror 11's deleted browsing data. Morelli also attested that it was unheard of and implausible for a company to direct an employee to delete their web-browsing history for fear of viruses. *Id.* at 31 (Page ID #8369). As time passes, Morelli explained, the more difficult it becomes to retrieve deleted phone and web-browsing data. *Id.* at 23–25 (Page ID #8361–63). Thus, the phone and its contents are lost, and the juror's web-browsing data are irretrievable.

At the April 18, 2019 hearing, Juror 11 also revealed that she had spoken with Nelson about the Laniers' case yet again *after* the *Remmer* hearing. As she had on previous occasions, Nelson reported this contact to the district court, *id.* at 13–15 (Page ID #8351–53). Supposedly, the district court told Nelson that it was "okay to speak to [Juror 11]"[11] and the two women then spoke about this case. *Id.* at 15 (Page ID #8353). "From [Nelson]," Juror 11 came to the understanding that "[the Laniers] were looking for something that could overturn this case or this proceeding that we went through." *Id. at* 13–14 (Page ID #8351–52). Juror 11 could not remember whether these conversations took place before or after she brought her phone and laptop to the court on February 16. *Id.* at 15 (Page ID #8353). It is therefore possible that this

---

[11]The Government points out that the district court told the Laniers at the *Remmer* hearing that Nelson had asked him if she could now speak with Juror 11 about the case. Appellee's Br. at 53. Although the Laniers initially acceded to the court's desire to grant Nelson's request, the Laniers then raised concerns that there may be a "potential situation which [they would] ask her not to talk to [Juror 11] further about this [case.]" R. 380 (*Remmer* Hr'g Tr. at 60) (Page ID #7251). The court told the court clerk to "tell [Nelson] for the time being that she should not discuss the matter with anyone" but indicated that he would not impose a gag order on Nelson. *Id.* Nelson could have interpreted the judge's refusal to impose a gag order as permitting her to discuss the case with Juror 11, the judge may have subsequently told Nelson that she could speak with Juror 11 about the case, or Juror 11 spoke untruthfully.

conversation took place before Juror 11's web-browsing history was manually deleted or before the juror discarded her phone. The district court failed to inform the Laniers of these post-*Remmer* conversations and has never addressed why it failed to do so. *See* Appellants' Br. at 7–8.

The district court denied the Laniers' motions for a new trial. R. 480 (3/2/20 Order at 1) (Page ID #8900). This appeal ensued.

## II. DISCUSSION

### A. "Meaningful Opportunity"

The Sixth Amendment guarantees a defendant the right to trial by an impartial jury. U.S. CONST. amend. VI. "The presence of even a single biased juror deprives a defendant of [their] right to an impartial jury." *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004). "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]" *Remmer v. United States*, 347 U.S. 227, 229 (1954). When a defendant raises a "colorable claim of extraneous influence[,]" a district court must fulfill its "duty to investigate and to determine whether there may have been a violation of the [constitutional guarantee]." *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (alterations in original) (quoting *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir.1985)). To comply with this obligation, a district court usually must conduct a *Remmer* hearing where the defendant has an opportunity to demonstrate jury bias. *See id.* We review for an abuse of discretion a district court's decision whether to grant a new trial based on jury misconduct. *See United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008).[12]

---

[12]In habeas cases, we must presume that state courts' findings are correct and adhere to the abuse-of-discretion standard. *See Carroll v. Renico*, 475 F.3d 708, 712 n.3 (6th Cir. 2007) ("[W]hile this Circuit in direct appeals may require more stringent procedures [in *Remmer* hearings], United States Supreme Court precedent guides our review of state habeas petitions."); *Garcia v. Andrews*, 488 F.3d 370, 377 (6th Cir. 2007) ("[H]ow we would apply our own Sixth Circuit precedents does not guide the analysis in the present [habeas] case. . . . [T]he Ohio Court of Appeals . . . did not engage in an unreasonable application of clearly established federal law as determined by the Supreme Court or reach a result contrary to that law."). Because we review the Laniers' case on direct appeal, we do not accord the district court with the heightened deference that is appropriate in habeas cases.

We are the only circuit that places on the defendant the burden of proving at the *Remmer* hearing "that an unauthorized contact was harmless." *United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988).**[13]** Yet a district court abuses its discretion by denying a defendant a "meaningful opportunity" to demonstrate jury bias. *United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998). Defendants are entitled to a "constitutionally[]meaningful *Remmer* hearing[.]" *Ewing v. Horton*, 914 F.3d 1027, 1033 (6th Cir. 2019). A judge's "bobtailed inquiry" into juror bias "flunk[s] the constitutional test that 'the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality.'" *Oswald v. Bertrand*, 374 F.3d 475, 481 (7th Cir. 2004) (internal quotation marks omitted) (quoting *Dyer v. Calderon*, 151 F.3d 970, 974–75 (9th Cir. 1998) (en banc)) (collecting cases); *see, e.g.*, *Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020); *Ewing*, 914 F.3d at 1030; *Herndon*, 156 F.3d at 636–37; *United States v. Walker*, 1 F.3d 423, 431 (6th Cir. 1993).

District courts wield "considerable"—but not infinite—discretion when deciding how to conduct a *Remmer* hearing. *United States v. Taylor*, 814 F.3d 340, 348 (6th Cir. 2016). To ensure an "adequate" investigation of jury bias, *Oswald*, 374 F.3d at 480, a *Remmer* hearing must be "unhurried and thorough[.]" *United States v. Davis*, 407 F. App'x 32, 37 (6th Cir. 2011) (quoting *Zelinka*, 862 F.2d at 96). The district court must permit "all interested parties" to "participate" at the hearing "to comport with due process[,]" *Balfour v. Howes*, 611 F. App'x 862, 864 (6th Cir. 2015) (quoting *Remmer*, 347 U.S. at 230). Defense counsel must be allowed to question the jury, *Davis*, 407 F. App'x at 37, unless counsel for both parties "concur[]" that the court may conduct the questioning, *United States v. Pennell*, 737 F.2d 521, 529 (6th Cir. 1984). District courts must allow for a meaningful investigation into the "circumstances" of the external communications, the "impact" of the communications on the jury, and "whether or not [the communications were] prejudicial.'" *Taylor*, 814 F.3d at 348 (alteration in original) (quoting *Remmer*, 347 U.S. at 229–30). "The question is whether, given the indications of jury bias, the

---

**[13]**Every other circuit court has held that the burden of proof regarding jury bias falls on the Government. *See Sheppard v. Bagley*, 657 F.3d 338, 350 n.1 (6th Cir. 2011) (Merritt, J., dissenting) (collecting cases); *see also* Eva Kerr, *Prejudice, Procedure, and A Proper Presumption: Restoring the* Remmer *Presumption of Prejudice in Order to Protect Criminal Defendants' Sixth Amendment Rights*, 93 Iowa L. Rev. 1451, 1476 (2008) (describing the Sixth Circuit as the "lone circuit discarding the *Remmer* presumption of prejudice").

judge's inquiry was adequate[,]" and "adequacy is a function of the probability of bias; the greater that probability, the more searching the inquiry [into juror bias is] needed." *Oswald*, 374 F.3d at 480; *see also Jackson v. Houk*, 687 F.3d 723, 736 (6th Cir. 2012) (quoting *Oswald*, 374 F.3d at 484). When evaluating whether juror bias is established, a district court must "objectively weigh all of the facts and circumstances of the case[,]" *United States v. Aguirre*, 108 F.3d 1284, 1288 (10th Cir. 1997), and "reasonably explore[] the issues presented," *Dyer*, 151 F.3d at 974–75.

The circumstances of the Laniers' case "taken not separately but together, created a sufficiently high probability of jury bias to require on the part of the trial judge a diligent inquiry." *Oswald*, 374 F.3d at 481. The district judge's handling of the *Remmer* hearing and his "minimally timely, minimally adequate, investigation" into Juror 11's illicit communications and research undershot the district court's constitutional obligations. *Id.* at 483. When there is evidence that, in the lead-up to a *Remmer* hearing, a juror has researched a case online or has electronically communicated with a third-party about the case, a district court must seek at minimum to preserve the relevant data and notify the defendants. Anything less flunks the Supreme Court's guarantee that defendants must have a meaningful opportunity to demonstrate these communications' "circumstances," their "impact[,]" and "whether or not [the contacts were] prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 230.

Days before the *Remmer* hearing, Nelson informed the district court that Juror 11—whose prior interactions with Nelson were the very reason that the hearing was convened—was now texting her about the case. It should have been immediately obvious, even without knowing the substance of the messages, that those texts were probative of Juror 11's potential bias at trial. A closer look at the messages' content confirms as much. Juror 11 asked Nelson "what in the world [is] this is about two years later"; she later inquired if Nelson "s[aw] the second part of [Juror 11's] original text on the federal case." R. 333 (*Remmer* Tr. at 62–63) (Page ID #6686–87). These messages should have alerted the district court that Juror 11 was seeking Nelson's substantive input about the case—the very act that she supposedly committed during deliberations and the *Remmer* hearing's instigating event. Worse, Juror 11 wrote "[w]hen I

looked online . . . [,]" warning the district court that the juror may have researched the case online either during or after the trial. *Id.* at 62 (Page ID #6686). The district court should have at least notified the Laniers so that they could adequately question Juror 11 at the *Remmer* hearing. It is unacceptable that district court failed to instruct Nelson to preserve the messages or to order Juror 11 to preserve her texts and web-browsing data.

By withholding this important information from the Laniers, the district court undermined the Laniers' ability to question Juror 11 thoroughly at the *Remmer* hearing in a constitutionally adequate manner. Yes, Nelson read out the texts during her testimony. But had the Laniers known of Juror 11's actions before the hearing, they could have moved to preserve the relevant phone and browsing data and could have used any data obtained to question and impeach Juror 11. The necessity of recovering this data became apparent at the hearing, where Juror 11 admitted—after spouting a string of contradictions—that she had looked up the case online and that she had spoken to her husband and Nelson about the case. Juror 11's spurious and inconsistent testimony portended her lack of credibility and her later destruction of the data. By failing timely to inform the Laniers of the texts and neglecting adequately to preserve the messages, the district court shackled the Laniers' cross-examination of Juror 11 and their investigation into the scope of her research and external contacts.

Had the district court acted swiftly post-hearing to preserve Juror 11's texts and browsing data, perhaps we would be satisfied that the Laniers had a meaningful opportunity to prove jury bias. But the district court compounded its initial error; the court's delays opened an eleven-month window for Juror 11 to destroy her phone and web-browsing data. The district court's three-week resistance of the Laniers' reasonable request to have Juror 11 produce her phone and computer allowed the juror an opening to wipe her browsing data. The judge then tasked his clerk and his IT staffer to take screenshots of the juror's devices instead of appointing a forensic expert to examine the devices properly. Thus, the court could have, but did not, document the data that Juror 11 deleted. Perplexingly, the court waited six weeks to inform the Laniers of the missing web-browsing data, which undermined the Laniers' ability to recover any relevant data not on the screenshots.

The Laniers then raised substantiated and reasonable concerns about the growing difficulty of recovering deleted data as time passes, that taking screenshots cannot adequately capture deleted messages and web-browsing data, and that a timely forensic examination of the devices was urgent. Yet the district court—based on ex parte advice—rejected the Laniers' sensible request, triggering a multi-month series of hearings. By the time the district court finally granted the Laniers' request to allow their forensic expert to examine the two devices, nearly eleven months had passed since Nelson had notified the district court that Juror 11 had texted her. These unfounded delays allowed Juror 11—who had repeatedly demonstrated a penchant for impermissibly disobeying the district court's orders, seeking Nelson's input about the case, and looking the case up online—to discard her phone. By according Juror 11 a lengthy timeframe to scour the relevant data, the district court enabled Juror 11 to rob the Laniers of an adequate chance to demonstrate any jury bias.

That the Laniers questioned every juror and Nelson at the *Remmer* hearing provided the Laniers with *some*, but not a *meaningful*, opportunity to satisfy their burden to demonstrate jury bias. Cross-examining jurors and witnesses may sometimes suffice, but "[t]o repeat, the greater the doubts, the more probing the inquiry that is required." *Oswald*, 374 F.3d at 481. We might have reached a different outcome had Juror 11 denied having ever researched the case or having reached out to others and there was no evidence to the contrary. But Juror 11's testimony was riddled with contradictions, and her text messages incontrovertibly confirm that the juror looked up the case online and contacted Nelson. The district court's failure to warn the Laniers of the texts "seriously handicapped [the Laniers] in preparing for the hearing[,]" *Dyer*, 151 F.3d at 978, and the court's prolonged delays—which resulted in Juror 11's destroying all relevant data—rendered unmeaningful the Laniers' opportunity to demonstrate bias. That the district court allowed the Laniers to question Juror 11 again is inapposite, because she had already discarded her phone and deleted her web-browsing history. Nor is it relevant that the forensic experts found no evidence from Juror 11's devices that she had researched the case; the juror deleted the pertinent data before the experts' investigations. The district court's allowing the Laniers forensically to image a phone that no longer exists and a computer that has been wiped of all

germane information is no less than "closing the barn door after the horse had escaped." *Oswald*, 374 F.3d at 481.**14**

We now consider the appropriate remedy. When a district court totally fails to investigate a defendant's allegations of juror bias, we usually mandate a *Remmer* hearing. *See Ewing*, 914 F.3d at 1032–33 (ordering a *Remmer* hearing in a habeas case because state trial court failed to investigate jury bias and due to concerns that ordering a new trial might "infring[e] on competing interests of comity, federalism, and finality"). Indeed, this was the relief that we ordered in *Lanier I*. 870 F.3d at 547. But when a district court conducts a constitutionally inadequate *Remmer* hearing that fails to guarantee a defendant a meaningful opportunity to demonstrate jury bias, as occurred here, a new trial is in order. *See Ewing*, 914 F.3d at 1033 (acknowledging the power to grant relief if a *Remmer* hearing is "constitutionally inadequate").

The practical implications of this case's unusual posture bolster our determination. The *Remmer* hearing occurred almost two years after the Laniers' convictions. Thus, the district court should have been extra attentive when ensuring that this belated, post-verdict hearing would serve as an adequate forum for investigating juror bias, especially because the accuracy of the information yielded at *Remmer* hearings declines over time. *See Oswald*, 374 F.3d at 484 (explaining "it is the *trial* judge's responsibility to conduct an adequate investigation, given the unsatisfactory character of an inquiry into jury bias after the trial is over and the defendant convicted"). This five-year fallout might have been averted had the district court meaningfully investigated Juror 11's phone call at the close of the Laniers' trial.

At this point, mandating yet another *Remmer* hearing—half-a-decade after the Laniers' convictions and long since Juror 11 obliterated her phone and browsing data—is both

---

**14**We are more understanding of a district court's attenuated investigations into juror bias when defendants do not seek a *Remmer* hearing or an otherwise more rigorous investigation. *See Carroll*, 475 F.3d at 711 ("It is significant that counsel never asked the trial court to conduct any further investigation or to question the jurors individually in closed chambers."); *see also United States v. Mack*, 729 F.3d 594, 606 (6th Cir. 2013); *United States v. Walker*, 160 F.3d 1078, 1083 (6th Cir. 1998); *Johnson v. Bagley*, 544 F.3d 592, 596 (6th Cir. 2008). But the Laniers requested a *Remmer* hearing and repeatedly (and reasonably) sought to preserve Juror 11's phone and browsing data.

constitutionally deficient and practically pointless. Thus, we conclude that the Laniers are entitled to a new trial.

## B. Reassignment

We previously expressed that we were reluctant to disqualify the district judge. *See* No. 16-6655, 16-6657 R. 38 (Sixth Cir. 2/15/18 Order at 2); *Lanier II*, 748 F. App'x at 677. Given the events that have transpired, we now conclude that the Laniers' new trial should be reassigned to another district judge on remand.

"[We] possess[] the power, under appropriate circumstances, to order the reassignment of a case on remand pursuant to 28 U.S.C. § 2106." *Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014). We consider three factors when determining whether reassignment is warranted:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* (quoting *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532–33 (6th Cir. 2012)).

Reassignment is proper in the present case for the same reasons that the Laniers were deprived of a meaningful opportunity to demonstrate juror bias. No doubt, "[r]eassignment is an extraordinary power and should be rarely invoked." *Id.* (quoting *Williams*, 696 F.3d at 532–33). But we continue to be "troubl[ed]" by the district court's not "directly reveal[ing]" to the Laniers before the *Remmer* hearing that Juror 11 had texted Nelson; the court's denying the Laniers an "adequate search" of Juror 11's phone "without an adequate explanation"; and the court's rejecting the Laniers' search parameters—which the Government did not contest—after the court communicated ex parte with Johnson. *Lanier II*, 748 F. App'x at 677. The district court's questionable handling of the Laniers' case compromised the appearance of justice; to avoid the mien of partiality, we order that this case be assigned to a different district judge on remand.

## III.  CONCLUSION

We conclude that the Laniers were deprived of a "meaningful opportunity" to prove juror bias and that the Laniers are entitled to a new trial before a different judge.  We reverse and remand for further proceedings consistent with this decision.